**In re AMCOR FUNDING CORPORATION, fka Lincoln American Financial Investment Company, a California corporation, Debtor.**

**Nos. CIV 89–1231 PHX–RMB, B 89–3119 PHX–RMB.**

United States District Court, D. Arizona.

May 1, 1990.

Ross M. Pyle, Jennings, Engstrand & Henrikson, San Diego, Cal., for plaintiff.

Donald W. Bivens, Meyer, Hendricks, Victor, Osborn & Maledon, Phoenix, Ariz., for defendant.

## ORDER

BILBY, District Judge.

The following facts give rise to the issues presently before the Court.

Amcor Funding Corporation (Amcor) filed a petition for voluntary relief under Chapter 11 of the Bankruptcy Code on April 13, 1989. Since that time, Amcor has operated the business as debtor in possession subject to the provisions of the Bankruptcy Code and under the supervision of the Bankruptcy Court.

Amcor entered into a Margin Account Agreement with Drexel Burnham Lambert, Inc. (Drexel) on May 17, 1988. Drexel's parent corporation, Drexel Burnham Lambert Group, Inc., has filed for protection under Chapter 11 of the Bankruptcy Code. On March 9, 1990, Amcor was notified by Mailgram that Drexel was liquidating its business and that Amcor must, by March 16, either transfer its account to another broker/dealer or pay its debit balance. If Amcor failed to do so, Drexel intended to "close out any short security or options positions, and liquidate sufficient securities to satisfy any debit balance which may exist in [the] account."

Amcor was unable to find a new broker/dealer to accept the account. Moreover, Amcor was advised by its financial consultant that it would be imprudent to allow Drexel to sell Amcor's assets for four reasons: (1) Drexel is liquidating, which could severely hamper Amcor's ability to recover from Drexel if the securities were liquidated below value; (2) Drexel has a conflict of interest because it is liquidating its own securities inventory, which includes several important issues also held by Amcor, thereby creating a risk that Amcor's assets could be compromised for positions held by Drexel; (3) Amcor would have to sell securities at low prices to raise the cash to pay off the debit balance; and (4) because of the illiquid nature of Amcor's bonds, substantial value could be lost if Amcor was forced to liquidate quickly.

On March 14, 1990, based on the foregoing recommendations, Amcor filed an Emergency Motion for Approval to Pay the Debit Balance of $21,384,473.60. The Court held a telephonic conference on that date, after which the Court issued to Drexel an Order to Show Cause why Drexel's proposed liquidation should be permitted despite the automatic stay imposed by 11 U.S.C. § 362.

At subsequent hearings on the Order to Show Cause, Drexel argued that two provisions of the United States Code render the automatic stay inoperative against Drexel's planned liquidation. The pertinent portion of 11 U.S.C. § 362(b)(6) provides:

> [U]nder subsection (a) of this section, of the setoff by a ... stockbroker ... of any mutual debt and claim under or in connection with ... securities contracts, as defined in section 741(7) of this title, that constitutes the setoff of a claim

against the debtor for a margin payment, as defined in section 741(5) ... of this title ... arising out of securities contracts against cash, securities, or other property held by or due from such ... stockbroker ... to margin, guarantee, secure or settle ... securities contracts.

Drexel argued that the following language from 11 U.S.C. § 555 was also applicable:

The exercise of a contractual right of a stockbroker ... to cause the liquidation of a securities contract as defined in section 741(7), because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title unless such order is authorized under the provisions of the Securities Investor Protection Act of 1970 (15 U.S.C. § 78aaa et seq.) or any statute administered by the Securities and Exchange Commission. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a national securities exchange, a national securities association, or a securities clearing agency.

"[C]ondition(s) of the kind specified in section 365(e)(1)" are:

(1) the insolvency or financial condition of the debtor at any time before the closing of the case;

(2) the commencement of a case under this title;

(3) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

Amcor argued that, for a variety of reasons, neither section 362(b)(6) nor section 555 apply to Drexel's proposed liquidation. American Continental Corporation's Unsecured Creditors Committee urged that its accountants had accumulated information concerning the volume and character of transactions between Drexel and Amcor which suggested the potential existence of causes of action for fraudulent conveyances. Amcor argued that it needed time, which would not be available if precipitous liquidation was permitted, to investigate those allegations.

The Court's decision is influenced by the following key facts. Amcor's Chapter 11 petition was filed one year ago. In the year that Amcor has conducted its business as debtor in possession, Drexel has neither demanded payment of the debit balance nor attempted to invoke the provisions of the statutes set forth herein. Drexel's current effort to liquidate Amcor's securities is precipitated exclusively by the bankruptcy of Drexel's parent, rather than by any condition of Amcor.

The Court holds that 11 U.S.C. § 555 does not provide a safe harbor for Drexel under these facts. Drexel's insolvency is plainly not a "condition of the kind specified in § 365(e)(1)." Each of the three § 365(e)(1) conditions are premised on the debtor's, in this case, Amcor's, insolvency. Drexel argues that its contract with Amcor permits it to liquidate for *any* reason, and that this broad language encompasses reasons triggered by § 365(e)(1). Such contract language, however, does not entitle Drexel to liquidate for any reason in disregard of the automatic stay. Drexel may liquidate without constraint by the automatic stay only if it is *in fact* doing so for one of the three reasons set forth in § 365(e)(1), or if some other exception applies.

Drexel perceives another exception in § 362(b)(6). It urges its view that the statutory language is unambiguous, and that the Court may not look beyond the bare wording to ascertain the role which Congress envisioned this exception would play in the context of the Bankruptcy Code. The Court finds ample ambiguity vis-a-vis the intended breadth of this exception to justify further inquiry into the purposes for which it was enacted.

The legislative history establishes that section 362(b)(6) was enacted to ensure that brokers and clearinghouses could immediately protect themselves and the market by rapidly closing out open positions upon the happening of a customer insolvency. The exception to the automatic stay was fash-

ioned to protect against risks described in the Statement of Commissioner Bevis Longstreth, on behalf of the Securities and Exchange Commission:

> The fundamental problem with the automatic stay provision in section 362 is that it would force a clearing agency or broker to obtain explicit judicial permission to close out the open securities positions of an insolvent broker or customer. Once a broker or customer is insolvent, the clearing agency—to take one example—will receive no further mark-to-market or clearance fund payments, even if the market continues to move against the insolvent broker's net securities position. At this point, the clearing agency can limit its loss exposure by closing out that net position. The automatic stay would prevent such a step until court permission could be obtained, by which time mounting losses may have rendered the agency itself insolvent, or at least resulted in further losses.

> The proposed amendments would extend and clarify section 362(b)(6) and other related provisions to make it clear that, in general, neither securities nor commodities brokers and clearing agencies can be stayed from exercising their rights to apply margin payments to close out open positions of brokers and customers.

> \*　　\*　　\*　　\*　　\*　　\*

> [W]e believe the suggested changes effectively accomplish their goal of protecting the integrity of securities clearance and settlement systems and related margin payments.

Bankruptcy of Commodity and Securities Brokers: Hearings before the Subcommittee on Monopolies and Commercial Law of the House Comm. on the Judiciary, 97th Cong., 1st Sess. 240–241 (1981). *See also:* House Report No. 97–420, 97th Cong., 2d Session (1982), U.S.Code Cong. & Admin. News 1982, 583 and 128 Cong. Rec. S. 15980–81.

In addition to looking at the legislative history behind this particular exception, Congress has made clear statements about the general purposes of exceptions to the automatic stay. Section 362 gives the debtor a "breathing spell" from creditors, and provides creditor protection as well. The stay exceptions are designed to ensure that, under certain discretely defined circumstances, the stay is not automatically imposed upon inception of a bankruptcy proceeding.

> Stays or injunctions issued under these other sections will not be automatic upon the commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon the commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine on a case-by-case basis whether a particular action which may be harming the estate should be stayed.

House Report No. 95–595 at 342, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6298.

Similarly, Collier on Bankruptcy states:

> [T]he exceptions to the automatic stay of section 362(a) which are set forth in section 362(b) are simply exceptions to the stay which protect the estate automatically at the commencement of the case and are not limitations upon the jurisdiction of the bankruptcy court or upon its power to enjoin. That power is generally based upon section 105 of the Code. The Court will have ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process ...

2 Collier on Bankruptcy (15th Edition) § 362.05.

Thus, the exceptions to the stay are generally fashioned to protect those who have dealings with insolvent debtors from automatic imposition of the § 362 stay in circumscribed situations in which Congress has determined that automatic imposition of a stay would pose unacceptable hard-

ships or risks. Section 362(b)(6) is cast in the same mold.

On the facts of this case, § 362(b)(6) was designed to shield Drexel and the securities market from sudden adverse effects arising out of Amcor's insolvency. This statutory exception to the automatic stay, while directed at the admittedly intricate nature of securities transactions, was not meant to permit insolvent brokers from liquidating their customers' accounts, whether within Chapter 11 or without, as a result of their own insolvency rather than in furtherance of the goals envisioned by Congress. Drexel's insistence upon the unilateral right to liquidate Amcor's account is animated exclusively by its own insolvency. The Court cannot permit Drexel, twelve months into Amcor's bankruptcy, to convert this exception into an offensive sword with which to ease its own bankrupt condition, at the expense of the Amcor estate.

The Court finds it unnecessary to reach the question whether the Court should exercise its general injunctive powers under § 105 of the Code. It is the ruling of this Court that the proposed liquidation is not covered by an exception to the automatic stay. The Court holds therefore that the automatic stay shall remain in full force and effect. Drexel is stayed from initiating a unilateral liquidation of the securities in Amcor's account. Amcor and Drexel are ordered to attempt to identify a third-party custodian who will, over the ensuing six-month period, devise a plan of orderly disposition of sufficient of Amcor's securities to pay Drexel's debit balance. Pending completion of that orderly disposition, funds obtained from those securities will be maintained in an escrow account to which Drexel's lien, in the amount of Amcor's debit balance, will attach. This will ensure that Drexel's right will be protected, while the ability of this Chapter 11 debtor to reorganize will not be unnecessarily impaired.