**In re ENRON CORP., et al., Debtors.**

No. 01–16034(AJG).

United States Bankruptcy Court, S.D. New York.

March 15, 2004.

Powell, Goldstein, Frazer & Murphy, LLP, Brad A. Baldwin, of counsel, Atlanta, GA, Stroock & Stroock & Lavan, LLP, Brian M. Cogan, of counsel, New York City, for Metropolitan Atlanta.

Cadwalader, Wickersham & Taft, LLP, Edward A. Smith, of counsel, New York City, Cadwalader, Wickersham & Taft, LLP, Mark C. Ellenberg, of counsel, Washington, DC, Special Counsel for Debtors.

## MEMORANDUM DECISION AND ORDER DETERMINING THAT AN ACTION COMMENCED BY THE METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY FOR DECLARATORY RELIEF IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA IS SUBJECT TO THE AUTOMATIC STAY AND DENYING ALTERNATIVE RELIEF SOUGHT BY THE METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY FOR RELIEF FROM THE AUTOMATIC STAY

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Before the Court is a motion by the Metropolitan Atlanta Rapid Transit Authority ("MARTA"), pursuant to sections 560 and 362(d) of the United States Bankruptcy Code ("Bankruptcy Code"), requesting that the Court enter an order deeming the automatic stay inapplicable or, in the alternative, granting relief from the automatic stay (the "Motion") to a petition[1] commenced by MARTA for declaratory relief in the Superior Court of Fulton County, Georgia (the "State Court Action").[2] Debtor Enron North America Corp. ("ENA"), filed an objection to the Motion (the "Objection"). The dispute between ENA and MARTA relates to a natural gas swap agreement. MARTA disputes the validity of the swap agreement and, if valid, the date the swap agreement was terminated whereas ENA seeks to enforce the swap agreement pursuant to its terms and pursuant to a December 2001 Termination Letter (defined below). For the reasons that follow, the Court concludes that the automatic stay applies to the State Court Action where MARTA does not seek to terminate the disputed swap agreement because of a condition specified in section 365(e)(1) in the State Court Action and MARTA has failed to justify relief from the automatic stay.

## I.

### Jurisdiction

The Court has subject matter jurisdiction under sections 1334(b) and 157(a) of title 28 of the United States Code and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to section 157(b)(2)(A) and (G) of title 28 of the United States Code.

## II.

### General Background

Commencing December 2, 2001, Enron Corp. and certain of its direct and indirect domestic subsidiaries (including ENA), commenced cases under chapter 11 of the Bankruptcy Code. ENA continues to operate its businesses and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

1. Where appropriate, the Court will refer to MARTA's Petition For Declaratory Judgment ("Pet.") dated April 18, 2003.

2. In support of the Motion, MARTA submitted the Affidavit of Michael Sloan, the Chief Counsel and Assistant General Manager of Legal Services for MARTA (the "Sloan Aff.").

## III.

### Facts

MARTA is a joint public instrumentality of several local municipal governments whose purpose is to alleviate traffic problems and congestion within the broader metropolitan Atlanta area by providing public transportation and developing traffic patterns and control. (Sloan Aff. ¶ 4.) Beginning in early 2001, MARTA and ENA (or one of its affiliates) discussed entering into an arrangement under which ENA would assist MARTA in hedging against fluctuations in the market price for natural gas.

ENA contends that MARTA is a party to a written swap agreement with ENA, dated as of May 11, 2001 (the "Swap Agreement"). The Swap Agreement consists of a signed confirmation and General Terms and Conditions, incorporated into the confirmation by reference. The Swap Agreement hedges the price of natural gas from June 1, 2001 through May 31, 2004. The Swap Agreement is cash-settled and, therefore, does not require the physical delivery of natural gas. The Swap Agreement was confirmed and ticketed by ENA on May 11, 2001. From June 2001 through the petition date, ENA and MARTA performed their respective obligations under the Swap Agreement. MARTA disputes the validity of any agreement with ENA.

In December 2001 shortly after ENA commenced the above-captioned bankruptcy case, MARTA delivered a termination letter to ENA relating to the Swap Agreement (the "December 2001 Termination Letter"). In the December 2001 Termination Letter, MARTA stated that it was terminating the master agreement (which includes the Swap Agreement and all other transactions subject to the master agreement) as of December 21, 2001 due to, among other things, the commencement of the chapter 11 case. The December 2001 Termination Letter was executed by Thay Bishop, MARTA's Director of Corporate Finance.

On April 18, 2003 and in response to demands from ENA concerning the Swap Agreement, MARTA filed the State Court Action seeking a declaratory judgment. (*See* Sloan Aff. ¶ 3.) MARTA alleges in the State Court Action that Ms. Bishop was not authorized by MARTA to execute any contract with ENA in connection with the Swap Agreement. In addition, MARTA alleges that Ms. Bishop was not authorized to send the December 2001 Termination Letter and therefore Ms. Bishop lacked the authority to terminate relations with ENA. Accordingly, MARTA seeks a declaratory judgment in the State Court Action (a) that there is no binding contract between MARTA and ENA and therefore MARTA owes ENA nothing or alternatively (b) that the Swap Agreement was not terminated on December 19, 2001 but was instead terminated by virtue of a termination letter delivered by MARTA to ENA on April 18, 2003 (the "April 2003 Termination Letter"). (*See* Pet. ¶ 23 at 5.)

In connection with the termination date and the Swap Agreement, MARTA alleges in the State Court Action that the date of termination could have considerable impact on the amount of payments owed by either party. Under the Swap Agreement, a party terminating the agreement would be required to calculate the amount of "termination payments" owed by either party based upon the market price of natural gas on the date of termination. ENA contends that the termination payment due to it as of December 21, 2001, under the terms of the Swap Agreement is $3,173,158, plus interest to the date of payment. It appears MARTA contends that based upon an April 18, 2003 termi-

nation date, a termination payment is due to MARTA from ENA for approximately $1,050,000.

The State Court Action consists of two counts. Count One is for declaratory judgment that no binding contract exists between the parties. Count Two is for declaratory judgment that MARTA did not terminate the contract on December 19, 2001. Count One provides, in relevant part, that:

> Enron's claim that the [c]onfirmation was a binding contract, and corresponding demand for payment of approximately $3,000,000 in termination payments pursuant to the [c]onfirmation, has created an actual controversy between MARTA and Enron. . . .
>
> Enron's demands have placed MARTA in a position of uncertainty and insecurity with respect to whether there exists a binding contract under which MARTA has any obligation to calculate and make termination payments to Enron. . . .
>
> A declaratory judgement as to the existence of a contract is necessary to protect MARTA from the risk of taking future undirected action that would jeopardize MARTA's interests.

(Pet. ¶¶ 17–19.)

Count Two provides, in relevant part, that:

> Enron's claim that MARTA terminated the [c]onfirmation on December 19, 2001 has created an actual controversy between MARTA and Enron. . . .
>
> Assuming the [c]onfirmation was a binding contract, Enron's claim that it was terminated on December 19, 2001 has placed MARTA in a position of uncertainty and insecurity with respect to the amount of termination payments due under the [c]onfirmation, because these payments are calculated with respect to

market prices on the date of termination. . . .

> [A] declaratory judgment concerning the effectiveness of the December 19, 2001 termination letter is necessary to protect MARTA from the risk of taking future undirected action that would jeopardized MARTA's interests.

(Pet. ¶¶ 21–23.)

## IV.

### Discussion

MARTA seeks an order from the Court declaring the automatic stay inapplicable to the State Court Action or, in the alternative, granting relief from the automatic stay to allow the State Court Action to continue. In short, MARTA argues that the automatic stay does not apply to the State Court Action because the State Court Action relates to the termination of a disputed swap agreement pursuant to section 560 of the Bankruptcy Code. Alternatively, MARTA argues that there is cause to modify the automatic stay should this Court determine that the automatic stay applies to the State Court Action.

**A. The Automatic Stay Is Applicable To The State Court Action Where MARTA Does Not Seek To Terminate A Swap Agreement Because Of A Condition Of The Kind Specified In Section 365(e)(1) Of The Bankruptcy Code**

**1.) Parties' Contentions**

According to MARTA, section 560 of the Bankruptcy Code exempts actions relating to the termination of a swap agreement from the automatic stay. MARTA argues that the automatic stay does not apply to the State Court Action because that proceeding relates to the invalidation, or alternatively termination, of a disputed swap agreement between ENA and MARTA.

MARTA contends that section 560 is one of several related amendments to the Bankruptcy Code passed by Congress in 1990 (collectively, the "Swap Amendments") in order to exclude swap agreements from the normal operations of the Bankruptcy Code. *See* 11 U.S.C. §§ 362(b)(17), 546(g) and 548(d)(2)(D).

MARTA asserts that the legislative history demonstrates that Congress intended the Swap Amendments to broadly immunize swap agreements from the otherwise restrictive, uncertain effects of bankruptcy. MARTA relies upon *Thrifty Oil Co. v. Bank of America Nat'l Trust and Sav. Assoc.*, 310 F.3d 1188, 1199 (9th Cir.2002) to support its interpretation of legislative intent and proper application of section 560.

■ Ultimately, MARTA urges this Court to avoid interpreting section 362(a) in a way that would apply the automatic stay to a judicial action that consists entirely of a disputed swap agreement. This is particularly true where, MARTA contends, section 560 provides that the right to terminate a swap includes any "right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice." MARTA alleges that the State Court Action represents a common law

right of a swap participant for a declaration as to whether a swap agreement is valid at all or, alternatively, as to when the swap was properly terminated.[3]

In response, ENA argues that section 560 of the Bankruptcy Code provides two specific safe harbors from the automatic stay neither of which applies to the State Court Action. Among other things, ENA contends that the plain language of section 560 of the Bankruptcy Code demonstrates that the exemption from the automatic stay conferred upon certain swap agreements does not extend to issues and disputes relating to the underlying validity or enforceability of such agreements.

According to ENA, the Swap Agreement definitively demonstrates that MARTA has a contractual right to terminate the Swap Agreement. ENA does not contest the validity or effect of the December 2001 Termination Letter. ENA posits that it is similar acts of termination that section 560 protects. ENA disputes whether MARTA has a right under section 560 to commence litigation concerning the consequences of termination in state court based upon the termination of a safe-harbor contract.

## 2.) Section 560

■ Swap participants are afforded a safe harbor under the Bankruptcy Code to

---

**3.** MARTA further argues that ENA is effectively a "nominal" defendant in the State Court Action that only seeks declaratory relief and therefore the automatic stay does not apply to the State Court Action. MARTA's contention is misplaced because MARTA relies principally upon a case dealing with interpleader actions and the applicability of the automatic stay. *See Price & Pierce Int'l Inc. v. Spicers Int'l Paper Sales Inc.*, 50 B.R. 25, 26 (S.D.N.Y. 1985) (holding that naming a debtor as a defendant to an interpleader action does not violate the automatic stay). The State Court Action is not an interpleader action and, therefore, this case is distinguishable from the instant matter. This Court is persuaded by other cases holding that section 362(a)(1) of

the Code applies to the continuation or commencement of declaratory judgment actions against the debtor. *See Commercial Union Ins. Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 31 B.R. 965, 970 (S.D.N.Y. 1983) (distinguishing interpleader actions and affirming bankruptcy court's conclusion that automatic stay applied to pending declaratory judgment action); *Advanced Computer Servs. v. MAI Sys. Corp.*, 161 B.R. 771, 774–75 (E.D.Va.1993) (concluding that automatic stay applied to complaint filed postpetition seeking declaratory and equitable relief). Thus, unless section 560 shields MARTA's actions, the initiation of the State Court Action was prohibited by section 362(a)(1).

terminate swap agreements with a debtor-counterparty. In relevant part, section 560 of the Bankruptcy Code provides that:

> The exercise of any contractual right of any swap participant to cause the termination of a swap agreement because of a condition of the kind specified in section 365(e)(1) of this title ... *shall not be stayed, avoided, or otherwise limited* by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 560 (emphasis added). In enacting section 560, Congress sought to protect financial markets from the volatility associated with delaying the final and prompt resolution of swap agreements. *See* H.R.Rep. No. 101–484, at 2 (1990), U.S.Code Cong. & Admin.News 1990, pp. 223, 224 ("U.S. bankruptcy law has long accorded special treatment to transactions involving financial markets, to minimize volatility. Because financial markets can change significantly in a manner of days, or even hours, a non-bankrupt party to ongoing securities transactions and other financial transactions could face heavy losses unless the transactions are resolved promptly and with finality."). Swap agreements typically provide the non-defaulting counterparty the right to terminate the agreement upon the other party's default. *See* 5 Alan N. Resnick & Frank J. Sommer, *Collier On Bankruptcy* ¶ 560.04[1] (15th ed. rev.2004) (hereafter *"Collier On Bankruptcy"*). Once terminated, a swap agreement typically provides that all transactions between the parties are cancelled and a single net amount will be due based upon market conditions at the time of termination. *See id.*

The rights of swap participants to terminate swap agreements contrast with some of the powers and protections that a debtor typically enjoys in a bankruptcy case.

Bankruptcy Code section 365(a) permits a debtor to assume or reject any executory contract. This is so even if the contract expressly provides for its automatic termination upon the filing of a bankruptcy petition. Under section 365(e)of the Bankruptcy Code, an executory contract of the debtor may not be terminated because of a provision in such contract that is conditioned upon:

> [1)] the insolvency or financial condition of the debtor at any time before the closing of the case; [2)] the commencement of a case under this title; or [3)] the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1). Bankruptcy termination clauses are commonly referred to as ipso facto clauses. "Ipso facto, or bankruptcy, clauses, 'automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy.'" *In re C.A.F. Bindery, Inc.,* 199 B.R. 828, 832 (Bankr.S.D.N.Y.1996) (quoting legislative history) (emphasis omitted). Ipso facto clauses are generally unenforceable pursuant to section 365(e) of the Bankruptcy Code because the automatic termination of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets. *See, e.g., Summit Inv. & Dev. Corp. v. Leroux,* 69 F.3d 608, 610 (1st Cir.1995) ("[The Bankruptcy Code] invalidate[s] contractual ipso facto provisions for the reason that automatic termination of a debtor's contractual rights frequently hampers rehabilitation efforts by depriving the chapter 11 estate of valuable property interests at the very time the debtor and the estate need them most.") (internal quotation marks and emphasis omitted); *In re C.A.F. Bindery,* 199 B.R. at 833 ("Bankruptcy interdicts ipso facto clauses because they lead to the forfeiture of valuable as-

sets and hamper the debtor's rehabilitation or liquidation.") (emphasis omitted).

■ Section 560 of the Bankruptcy Code provides an exception to the non-enforceability of ipso facto clauses in connection with swap agreements [4] in a bankruptcy case. Section 560 preserves the rights of a non-defaulting counterparty to a swap agreement to terminate the contract based upon, among other things, the filing of a bankruptcy petition. *See* 11 U.S.C. § 560; *In re Board of Directors of Compania General de Combustibles S.A.*, 269 B.R. 104, 112 (Bankr.S.D.N.Y.2001) (discussing section 560 in the context of an ancillary proceeding). Section 560, however, does not provide a swap participant an unqualified right to terminate a swap agreement. Section 560 simply permits the exercise of termination rights by a non-defaulting swap participant so long as the enforcement of those rights is first triggered because of a condition of the kind specified in section 365(e)(1). *See* 5 *Collier On Bankruptcy* ¶ 560.04[3] ("It should be noted that section 560 does not protect the exercise of swap agreement termination rights for all kinds of defaults. Rather, it protects only rights triggered by 'a condition of the kind specified in section 365(e)(1)' (i.e., so-called ipso facto clauses or bankruptcy defaults)"). This provision does not permit a non-defaulting counterparty to terminate a swap agreement because of some other reason. *See id.* Hence, the right to exercise termination rights does not arise from all types of defaults but only from defaults first triggered because of one of the otherwise proscribed ipso facto provisions.

■ The analysis used by the district court in *In re Amcor Funding Corp.*, 117 B.R. 549 (D.Ariz.1990) illustrates section 560's contours. In *Amcor Funding*, the district court held that a similar provision of the Bankruptcy Code (section 555 [5]) did not provide a safe harbor to liquidate a securities contract where the facts did not establish that the counterparty sought to exercise its rights as a result of the three reasons set forth in section 365(e)(1). [6] *See Amcor Funding*, 117 B.R. at 551.

---

4. Under section 101(53B) a "swap agreement" means

(A) an agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, forward rate agreement, commodity swap, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, any other similar agreement (including any option to enter into any of the foregoing);
(B) any combination of the foregoing; or
(C) a master agreement for any of the foregoing together with all supplements.

5. Section 555 provides, in pertinent part, that:

The exercise of a contractual right of a stockbroker, financial institution, or securities clearing agency to cause the liquidation of a securities contract ... because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. ...

6. A comparison of section 560 and section 555 suggests that these provisions are analogous. Whereas section 560 governs the termination of swap agreements, section 555 deals with the liquidation of securities contracts. The exercise of contractual rights to terminate (section 560) and liquidate (section 555) are both triggered by a condition of the kind specified in section 365(e)(1). There is a presumption that identical words in different parts of the same statute have the same meaning. *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). This presumption is not absolute and the presumption may be rebutted where it can be reasonably concluded that

In *Amcor Funding*, Amcor Funding Corporation ("Amcor") entered into a margin account with Drexel Burnham Lambert Group, Inc. ("Drexel") in May 1988. Amcor filed a chapter 11 case in April 1989. Sometime thereafter, Drexel filed its own chapter 11 case. In March 1990, Amcor was notified that Drexel was in the process of liquidating its own business. Pursuant to the notice, Amcor was required to either transfer its margin account or pay a debit balance to Drexel. In the event that Amcor failed to abide by the terms of the notice, Drexel intended to liquidate securities to satisfy any balance which existed in the account.

In response to an order to show cause why Drexel's proposed liquidation should be permitted despite the automatic stay, Drexel argued, among other things, that section 555 rendered the automatic stay inoperative against the planned liquidation. In rejecting Drexel's contention, the district court relied on the fact that Drexel waited over a year to assert its rights as well as the fact that Drexel's effort to liquidate Amcor's securities was precipitated exclusively by Drexel's own financial condition. The district court held that Drexel's insolvency is plainly not a condition of the kind specified in section 365(e)(1) and reasoned instead that section 365(e)(1) is premised upon the debtor's (Amcor's) insolvency. Ultimately, the district court concluded that Drexel could have liquidated the account without being subject to the automatic stay only if Drexel was in fact doing so for one of the reasons set forth in section 365(e)(1) or

because some other exception applied. *Amcor Funding*, 117 B.R. at 551.

Applied here, MARTA's allegations in the State Court Action demonstrate that MARTA is not in fact attempting to terminate the Swap Agreement for any of the reasons set forth in section 365(e)(1). Rather, both counts of the State Court Action are premised upon MARTA's position of uncertainty and insecurity and the fact that a declaratory judgment is necessary to protect MARTA from the risk of taking undirected action that would jeopardize MARTA's interests. MARTA's insecurity is plainly not a condition of the kind specified in section 365(e)(1). Therefore, the initiation and continued prosecution of the State Court Action is not excepted from the operation of the automatic stay by virtue of section 560. Thus, the State Court Action is subject to the automatic stay.

## B. MARTA Is Not Entitled To Relief From The Automatic Stay

### 1.) MARTA's Contention

In the alternative, MARTA requests that the Court grant relief from the automatic stay. Specifically, MARTA asks for the Court to "lift" the automatic stay pursuant to section 362(d)(1) to allow the State Court Action (that seeks declaratory relief) to continue.[7] (Mot.¶¶ 22, 24.) MARTA requests that the Court lift the automatic stay notwithstanding that the State Court Action was commenced over one year after the initiation of ENA's

---

the words were used with different intent. *Id.; see also In re Robinson*, 228 B.R. 75, 81 n. 5 (Bankr.E.D.N.Y.1998) (noting same).

**7.** MARTA also argues that relief from the automatic stay is justified based upon section 362(d)(2). MARTA contends that because the purported Swap Agreement is not a valid and

binding agreement as against MARTA, ENA has no "equity" interest in the Swap Agreement. Without further explanation, the Court concludes that MARTA has failed to meet its burden of proof. *See* 11 U.S.C. § 362(g). The Court, therefore, denies MARTA's motion for relief from stay pursuant to section 362(d)(2).

bankruptcy case and the imposition of the automatic stay.

### 2.) Automatic Stay

■ The filing of a bankruptcy petition operates as a stay applicable to all entities regarding the commencement or continuation of judicial proceedings against the debtor. *See* 11 U.S.C. § 362(a)(1).[8] The protections of the stay are automatic and mandatory with the filing of the bankruptcy petition. *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus. Inc. (In re Elder–Beerman Stores Corp.)*, 195 B.R. 1019, 1023 (Bankr.S.D.Ohio 1996). The automatic stay applies to the commencement or continuation of declaratory judgment actions against the debtor. *See Commercial Union Ins. Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 31 B.R. 965, 970 (S.D.N.Y.1983) (affirming bankruptcy court's conclusion that automatic stay applied to pending declaratory judgment action); *Advanced Computer Servs. v. MAI Sys. Corp.*, 161 B.R. 771, 774–75 (E.D.Va.1993) (concluding that section 362(a)(1) applied to complaint filed postpetition seeking declaratory and equitable relief).

■ The scope of the automatic stay is broad, *see AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*, 117 B.R. 789, 798 (Bankr.S.D.N.Y.1990) ("Congress intended that the scope of the automatic stay be broad in order to effectuate its protective purposes on behalf of both debtors and creditors ...."), and is a fundamental debtor protection, *e.g., Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) (citing legislative sources), that not only protects debtors but protects creditors as well. *See, e.g., Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 849 (Bankr.S.D.N.Y.1994). It has been observed that:

> The automatic stay ... promote[s] two principal purposes of the Bankruptcy Code. First, the automatic stay provides the debtor with a breathing spell from ... creditors. [Second,] the automatic stay allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.

*Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 989 (2d Cir.1990) (internal citations and quotation marks omitted).

■ Nevertheless, section 362(d)(1) of the Bankruptcy Code empowers the bankruptcy court to grant relief from the stay "for cause", such as by terminating or annulling the automatic stay. The Bankruptcy Code does not define the meaning of the phrase "for cause." *E.g., Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir.2002). In determining whether there is cause to grant relief from the automatic stay, a court in this circuit should examine the factors outlined in *Sonnax Indus., Inc. v. Tri Compo-*

---

**8.** Section 362(a)(1) provides:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

*nent Products Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir.1990). These factors are:

> (1) whether relief would result in a partial or complete resolution of the issues;
>
> (2) lack of any connection with or interference with the bankruptcy case;
>
> (3) whether the other proceeding involves the debtor as a fiduciary;
>
> (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
>
> (5) whether the debtor's insurer has assumed full responsibility for defending it;
>
> (6) whether the action primarily involves third parties;
>
> (7) whether litigation in another forum would prejudice the interests of other creditors;
>
> (8) whether the judgment claim arising from the other action is subject to equitable subordination;
>
> (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
>
> (10) the interests of judicial economy and the expeditious and economical resolution of litigation;
>
> (11) whether the parties are ready for trial in the other proceeding; and
>
> (12) impact of the stay on the parties and the balance of harms.

*Id.* (citing *In re Curtis*, 40 B.R. 795, 799–800 (Bankr.D.Utah 1984) (hereafter "Sonnax Factor(s)")). All twelve Sonnax Factors will not be relevant in every case, *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 143 (2d Cir.1999), nor will a court accord equal weight to each element.

*Burger Boys, Inc. v. South St. Seaport Ltd. P'Ship (In re Burger Boys, Inc.)*, 183 B.R. 682, 688 (S.D.N.Y.1994); *In re New York Medical Group, P.C.*, 265 B.R. 408, 413 (Bankr.S.D.N.Y.2001).

■■■■ The burden of proof on a motion to modify the automatic stay is a shifting one. *Sonnax*, 907 F.2d at 1285. The initial burden rests on the movant to show cause to modify the stay. *Bogdanovich*, 292 F.3d at 110; *Mazzeo*, 167 F.3d at 142; *Sonnax*, 907 F.2d at 1285. Only if the movant makes an initial showing of cause does the burden then shift to the party opposing the relief. *Mazzeo*, 167 F.3d at 142. Once a legally sufficient basis, or cause, is demonstrated by the movant, the party opposing the relief must prove that it is entitled to the continuing protections of the automatic stay. *In re M.J. & K. Co., Inc.*, 161 B.R. 586, 590 (Bankr.S.D.N.Y.1993). If the movant fails to meet its initial burden of demonstrating cause, relief from the automatic stay should be denied. *Bogdanovich*, 292 F.3d at 110; *Mazzeo*, 167 F.3d at 142; *Sonnax*, 907 F.2d at 1285. The determination whether to modify the automatic stay depends upon the facts of each motion. *Bogdanovich*, 292 F.3d at 110.

■■■ Here, the Court concludes that MARTA has failed to establish cause to justify relief from the automatic stay.[9] MARTA principally relies upon Sonnax Factor four (whether a specialized tribunal with the necessary expertise has been established to hear the cause of action) to justify the relief that it seeks. (*See* Mot. at ¶ 25.) The Court relies upon Sonnax Factors two (lack of any connection with or interference with the bankruptcy case) and twelve (impact of the stay on the parties and the balance of harms) in reaching a contrary conclusion.

9. The Court has considered and given due regard to all the relevant Sonnax Factors. The Court, however, confines its discussion to only those factors the Court deems dispositive in this case.

The issues to be determined in the State Court Action appear to be similar to issues already raised in connection with these bankruptcy cases. As ENA points out, issues as to the validity of swap agreements and other contracts, termination thereof, and the amount of termination payments due and owing are issues that ENA is seeking to resolve with all of its various counterparties. The termination payments due in connection with thousands of trading contracts with hundreds of counterparties represents one of the largest assets of the debtors' estates. The debtors, including ENA, have commenced adversary proceedings with various counterparties who elected early termination of their respective swap agreements and similar agreements under the safe harbor provisions contained in the Bankruptcy Code. In each of these adversary proceedings, issues such as contract validity, contract termination and the amount of termination payments are in dispute.

Accordingly, the issues raised in the State Court Action have a greater connection to the efficient administration of this case and has a correspondingly greater impact on ENA than MARTA acknowledges. The Court can see no reason for permitting litigation to proceed in state court, where this Court has or will be confronted with similar issues in connection with ENA's reorganization. MARTA will not be harmed by having to litigate issues against ENA outside of Georgia. Indeed, MARTA could have originally sought declaratory relief against ENA from this Court. *See* Fed. R. Bankr.P. 7001(2), (9). Hence, the Court finds that there is no compelling reason for allowing the State Court Action to proceed where such action would be inconsistent with the administrative needs of the bankruptcy case and the proposed litigation can be dealt with outside that forum.

As further support that MARTA has failed to establish cause, the Court relies upon the timing of the Motion and its impact upon the bankruptcy case. At the time the Motion was filed, ENA, along with all the above-captioned debtors, was in the process of negotiating and formulating a plan of reorganization. To divert that process in order to proceed with litigation in a non-bankruptcy forum would interfere with the reorganization process and would necessarily harm ENA's chances to confirm a plan.

In any event, the Court denies MARTA's Motion because MARTA has failed to move for an annulment of the automatic stay. Proceedings and actions described in section 362(a)(1) are void if they occur after the imposition of the automatic stay. *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 527 (2d Cir.1994). An order annulling the automatic stay has retroactive effect and validates actions or proceedings that would otherwise be deemed to be void ab initio. *Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc.,* 157 F.3d 169, 172 (2d Cir.1998). An order terminating or "lifting" the automatic stay operates only from the date of entry of the order and does not affect the status of actions taken between the filing of the petition and the entry of the order. *Id.* The distinction between annulment and termination can be crucial because the party seeking to validate a void action (generally, the creditor) must move to annul the stay. *See In re Best Payphones, Inc.,* 279 B.R. 92, 97–98 (Bankr.S.D.N.Y.2002) (describing the distinction between annulment and termination and finding that the difference is more than semantic. Ultimately, the bankruptcy court concluded that relief from the automatic stay to proceed with an appeal was moot because the order to be appealed was void in the absence of an annulment.). Here, MARTA should have requested that this Court annul, rath-

er than "lift" or terminate, the automatic stay because the State Court Action was filed after the imposition of the automatic stay. The State Court Action is deemed void absent an annulment. Terminating rather than annulling the automatic stay to continue with an action that is deemed void as against ENA makes no sense. The Court, therefore, denies MARTA's request for relief from the automatic stay on this basis as well.

## V.

### Conclusion

For the foregoing reasons, it is hereby

ORDERED that the automatic stay applies to the State Court Action, and it is further

ORDERED that MARTA is not entitled to relief from the automatic stay, and it is further

ORDERED that the State Court Action is void as a violation of the automatic stay.