**In re O.P.M. LEASING SERVICES, INC., Debtor.**

**Bankruptcy No. 81 B 10533.**

United States Bankruptcy Court, S.D. New York.

Jan. 15, 1986.

See also 16 B.R. 932; 13 B.R. 54; 21 B.R. 986; 28 B.R. 740; 30 B.R. 642; 32 B.R. 199; 35 B.R. 854; 40 B.R. 380; and 46 B.R. 661.

Zalkin, Rodin & Goodman, New York City, for Trustee; Richard S. Toder, Menachem O. Zelmanovitz, Peter Levine, of counsel.

Morrison, Cohen & Singer, New York City, for Northrop Corp.; Malcolm Lewin, of counsel.

## DECISION AND ORDER ON O.P.M.'S OBJECTION TO CLAIM AND NORTHROP'S MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

The parties to the present claim objection dispute, James P. Hassett, the Trustee ("Trustee") for the debtor, O.P.M. Leasing Services, Inc. ("O.P.M."), and Northrop Corporation ("Northrop"), seek a ruling on whether Northrop's claim against O.P.M. should be discounted to its value as of the date O.P.M. filed its bankruptcy petition (the "Filing Date"). The atypical facts in this case have complicated an otherwise straightforward analysis, but the interplay of sections 365(g), 502(b) and 502(g) of the Bankruptcy Reform Act of 1978 ("Code") mandate that the claim be discounted to its present value as of the Filing Date.

*Facts*

O.P.M. is in the business of buying, selling and leasing new and used computers and related equipment. On April 24, 1980, O.P.M. and Northrop entered into a Master Agreement of Lease ("Master Lease") whereby Northrop agreed to lease certain equipment from O.P.M. The specific equipment to be leased was to be set forth and described in certain Equipment Schedules ("Schedules") which the parties were to enter into from time to time pursuant to

the Master Lease. Section 1 of the Master Lease stated that:

Each Equipment Schedule shall incorporate therein all of the terms and conditions of this Master Lease unless any provisions hereof are specifically excluded or modified therein and shall contain such additional terms and conditions as Lessor [O.P.M.] and Lessee [Northrop] shall agree upon. Each such Equipment Schedule (together with the terms and conditions of this Master Lease to the extent incorporated therein) shall constitute a separate lease.

On April 30, 1980, Northrop and O.P.M. entered into Schedules 1 and 2 which leases commenced on June 1, 1980; the parties entered into Schedules 3 and 4 on May 14, 1980, which leases commenced on July 1, 1980. Each Schedule involved equipment manufactured and supplied by International Business Machines and had a term of 48 months. Schedules 1 and 2 were to expire on May 31, 1984 and Schedules 3 and 4 were to expire on June 30, 1984.

Section 7.1 of the Master Lease obligated Northrop to enter into and maintain in force a standard maintenance contract for the leased equipment. Section 4(d) of each Schedule, however, superceded Section 7.1 and provided that O.P.M., and not Northrop, would pay the monthly maintenance charge. Other significant provisions of the Master Lease included Section 5.3 which allowed O.P.M. to assign its interest in the Schedules. Paragraphs 3 and 4 of Section 5.3 stated that Northrop's "obligation to pay directly to such assignee the amounts due ... shall be absolutely unconditional" and that Northrop "shall pay all amounts due from [Northrop] under any Equipment Schedule (whether as rent or otherwise) to such assignee, notwithstanding any defense, offset for counterclaim whatever, whether by reason of breach of such Equipment Schedule or otherwise which it may or might now or hereafter have as against [O.P.M.]" (the "hell and high water clause"). O.P.M. subsequently assigned its right to receive the rental payments under the Schedules to certain financial institutions (the "Assignees"). O.P.M. consequently did not receive any of the rental payments which were due or became due under the Schedules. Northrop, however, had an unconditional obligation to make rental payments under the hell and high water clause contained in the lease, even if it returned the leased equipment.

Pursuant to Section 4(b) of the Schedules, Northrop had the option of terminating the leases prior to their expiration date by, *inter alia*, making payment to the Assignees of a specified lump sum amount for which O.P.M. would be obligated to reimburse Northrop. This termination option was never exercised by Northrop. The Schedules also contained a so-called Dollar Option which allowed Northrop to extend the lease term at a rental of one dollar per month for an additional 48 months in the event O.P.M. failed to pay the monthly maintenance charge (and failed to cure within ten days). *See In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 108 (Bankr. S.D.N.Y.1982) (discussion of Dollar Option).

On March 11, 1981, O.P.M. filed its petition for reorganization under Chapter 11 of the Code. James P. Hassett, the Trustee for O.P.M. was appointed pursuant to this court's March 23 and 27, 1981 orders. Thirty-three months later, on December 14, 1983, the Trustee moved to reject each Schedule pursuant to § 365(a) of the Code. The Trustee in his application explained that pursuant to Section 4(d) of the Schedules, an O.P.M. default in making monthly maintenance payments would allow Northrop to exercise the Dollar Option. The Trustee "determined that the Equipment [was] worth substantially more than the rental Northrop would pay pursuant to the Dollar [Option]. Consequently, the [O.P.M.] Estate [would] not be able to realize any value from the Equipment in the event Northrop [was] allowed to retain the Equipment under the Dollar [Option]." The Trustee therefore sought to reject the Schedules. The Trustee, however, did not seek return of the equipment prior to the expiration of the Schedule leases so long as Northrop continued to maintain and insure

the Equipment as required by the Master Lease and the Schedules. Northrop remained in possession of the equipment until the expiration dates of the respective Schedules, and maintained and insured the equipment as required.

On December 29, 1983, this court signed an order authorizing and approving the rejection of the Schedules. The order specifically provided that "Northrop ha[d] thirty (30) days from the entry of th[e] order to file its claim, if any, for damages resulting from the rejection." As of December 29, 1983, Northrop had made thirty-three monthly maintenance payments on Schedules 1, 2, 3 and 4 which O.P.M. had been obligated to make. Five further monthly maintenance payments remained to be made on Schedules 1 and 2; six payments remained on Schedules 3 and 4. Pursuant to various stipulations entered into by the parties with this Court's approval, Northrop's time to file its claim for damages was extended from January 30, 1984 to April 2, 1984.

On April 2, 1984, Northrop filed its damages claim seeking $1,349,344.37 partly as an administrative priority claim and partly as a general unsecured claim. This amount originally included $812,788.37 as reimbursement for the maintenance payments Northrop paid postpetition. Northrop claimed that these payments which were actually made after the Filing Date, benefitted the O.P.M. estate since the equipment continued to be serviced postpetition. To that extent, Northrop asserted its entitlement to an administrative priority status. Northrop also claimed it suffered $536,556 in damages resulting from its inability to purchase the equipment pursuant to the Dollar Option because of the Trustee's rejection.

The Trustee objected to various aspects of Northrop's claim and argued that $635,265 rather than $812,788.37 should be allowed for reimbursement of maintenance

payments ("rejection damages"). The Trustee further sought to discount the entire $635,265 amount to its value as of the Filing Date because the Code classifies this claim as a prepetition claim. He applied a discounting factor of thirteen percent which resulted in a figure of $510,145.99.[1] In addition, the Trustee asserted that Northrop did not have a valid claim for the alleged loss of $536,556 resulting from the failure to exercise the Dollar Option. *See In re O.P.M. Leasing Services, Inc.*, 23 B.R. at 115 ("the Dollar Option is a penalty provision and is unenforceable as a matter of law"). Finally, the Trustee objected to the classification of any portion of Northrop's claim as an administrative priority claim.

Northrop moved for partial summary judgment pursuant to Fed.R.Civ.P. 56(c) and Bankruptcy Rule 7056 seeking the dismissal of that part of the Trustee's objection relating to valuation of Northrop's claim as of the Filing Date. The parties subsequently entered into a stipulation under which Northrop agreed to amend and reduce its proof of claim from a combined administrative priority and general unsecured claim of $1,349,344.37 to a general unsecured claim of $635,265. The Trustee reserved his rights under the stipulation to object to the amended claim and to seek to have it reduced to its value as of the Filing Date.

The parties have agreed that there are no triable issues of fact. Thus, the entire classification and quantum controversy has been distilled into a question of whether or not to present value a general unsecured $635,265 debt as of the Filing Date.

*Discussion*

A. *The Equipment Schedules Were Unexpired Leases Which the Trustee Was Entitled to Reject Pursuant to § 365(a)*

■ Section 365(a) of the Code provides in pertinent part that "the trustee, subject

---

1. A thirteen percent discount rate was uniformly applied to all claims by the Trustee and was considered a conservative rate given the prime rate for various financial institutions of eighteen to nineteen percent at or about the petition

date. Furthermore, for ease of administration, claims were valued back to April 1, 1981 rather than the petition date of March 11, 1981. The applied discount rate has not been disputed.

to the Court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Although this section does not codify the standard for the rejection of an unexpired lease, a business judgment rule is generally employed. *See, e.g., In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 118 (Bankr.S.D.N.Y.1982). As set forth in § 365(d)(2), the time frame in which a trustee or a debtor in possession may assume or reject an unexpired lease for personal property or residential real property in a Chapter 11 case is "any time before the confirmation of a plan" of reorganization.[2] If a significant period of time elapses before the trustee or debtor in possession moves to assume or reject, an interested party may invoke Section 365(d)(2) which provides that "the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." Thus a contract partner can pre-empt the Trustee in forcing an early determination of performance intention.

In the present case, the Schedules were unexpired leases which the Trustee sought to reject because they were considered burdensome. O.P.M. was not receiving the rental payments due under the Schedules because they had been assigned to others, yet O.P.M. was required to make the maintenance payments. The Trustee determined that the rejection of the Schedules would benefit the estate and made an application to reject thirty-three months after his appointment, but prior to confirmation of a plan, and this court approved the rejection of the Equipment Schedules. It should be noted that Northrop did not at any time seize the initiative and request this court to order the Trustee to expedite his determination of whether to assume or reject the Schedules pursuant to

§ 365(d)(2). Nor did Northrop seek to exercise its rights under the termination clause of Section 4(b) of the Schedules. It apparently preferred to keep, use and maintain the equipment, so long as it was bound under the hell and high water clause. *See In re O.P.M. Leasing Services, Inc.*, 21 B.R. 993, 1005 (Bankr.S.D.N.Y. 1982) (hell and high water clause "given full force and effect as a matter of law.")

B. *The Rejection of the Equipment Schedules by the Trustee Entitled Northrop to a General Unsecured Claim for Damages*

Section 365(g)(1) provides that the rejection of an executory contract or unexpired lease "constitutes a breach of contract or lease," which is treated as occurring "immediately preceding the date of the petition." *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 349 (1977) *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6305; S.Rep. No. 989, 95th Cong., 2d Sess. 60, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5846. ("The purpose is to treat rejection claim[s] as prepetition claims."). *See also N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1198, 79 L.Ed.2d 482 (1984) (rejection relates back to filing of petition). In *In re Davies*, 27 B.R. 898 (Bankr.E.D.N.Y.1983), the bankruptcy court observed that "[u]nder the Code, a rejection gives rise to a *legal fiction* that a breach of the contract occurred immediately prior to the filing of the petition." *Id.* at 900 (citing § 365(g)(1) ) (emphasis added). *See also Solon Automated Services, Inc. v. Georgetown of Kettering, Ltd.*, 22 B.R. 312, 316 (Bankr.S.D.Ohio 1982)(damages flowing from rejection are constructively treated as prepetition claims). Whether a legal fiction or a constructive treatment rationale is utilized, the Code and accompanying legislative history make it clear that the postpeti-

---

2. It should be noted that the time within which an executory contract or unexpired lease must be assumed or rejected differs in Chapter 11 and 7 cases. In a Chapter 7 liquidation, § 365(d)(1) provides:

if the trustee does not assume or reject an executory contract or unexpired lease of resi-

dential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

tion rejection of an unexpired lease is considered a prepetition event, which for classification purposes renders the rejection damages claim a general unsecured one. Therefore, even though Northrop made the payments after O.P.M. filed its petition, Northrop's resulting claim for damages will be treated as a general unsecured claim, unless Northrop can show that the maintenance payments benefitted the estate.

■ Payments made after the filing of a petition are generally accorded priority status as an administrative expense by § 507, when they are determined to have benefitted the estate. Section 503(b)(1)(A) defines an administrative expense as including "the actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case." In *Bildisco*, the Supreme Court stated that:

> if the Trustee elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the Trustee is obligated to pay for the reasonable value of those services, *Philadelphia Co. v. Dipple*, 312 U.S. 168, 174 [61 S.Ct. 538, 541, 85 L.Ed. 651] (1941), which, depending on the circumstances of a particular contract, may be what is specified in the contract.

104 S.Ct. at 1199. The rationale for according certain postpetition claims priority status is to prevent the reorganization or administration of the estate from being jeopardized by creditor refusal to deal with the debtor postpetition. *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1355 (9th Cir. 1983) In *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2d Cir.1960), the Second Circuit stated:

> The claim of a creditor having an executory contract with the debtor at the time the debtor's petition is filed is entitled to priority ... only if the trustee or debtor in possession elects to assume the contract or if he receives benefits under

it.... Where no benefits are received by the bankrupt estate or its representative under the contract, and the contract is not assumed, the creditor's claim is not entitled to priority....

*Id.* at 124 (citations omitted). *See also In re Unishops, Inc.*, 553 F.2d 305, 308 (2d Cir.1977); *In re O.P.M. Leasing Services, Inc.*, 23 B.R. at 121; *In re Adwar Video Corp.*, 38 B.R. 628, 629 (Bankr.S.D.N.Y. 1984); Bordewieck, *The Postpetition, Pre-Rejection Pre-Assumption Status of an Executory Contract*, 59 Am.Bankr.L.J. 197, 223 (1985). Moreover, "[w]here a creditor incurs expenses primarily in its own interest, this creditor is not entitled to a priority administrative claim." *In re O.P.M. Leasing Services, Inc.*, 23 B.R. at 121 (citing *In re McK, Ltd.*, 14 B.R. 518, 520 (Bankr.D.Colo.1981) ).

■ In the present case, however, even though Northrop made the maintenance payments after O.P.M. filed its petition, the O.P.M. estate did not benefit within the meaning of § 503(b)(1)(A) from these payments.[3] This outcome results from the financial and contractual arrangments which O.P.M. had entered into with various parties. Because O.P.M. had assigned its right to receive any of the lease payments due under the Schedules to certain institutions, the maintenance payments were simply a burdensome drain on O.P.M.'s resources. Moreover, it was in Northrop's interest and benefit to make the payments, because they allowed Northrop continued use of the equipment. Nonetheless, O.P.M. was contractually obligated to make these payments and its failure to do so and the Trustee's subsequent rejection gave rise to Northrop's claim for damages. Therefore, the parties have correctly stipulated that Northrop's claim is to be classified as general unsecured pursuant to § 365(g).

C. *In Calculating Northrop's Damages, Its Claim is Considered as Arising Prior to the Filing of the Petition*

Claims arising from § 365(g) breaches are allowed under § 502(g) which provides:

---

**3.** Classification as an administrative expense would not only have accorded Northrop's claim priority, but would have rendered moot any discussion of discounting Northrop's claim.

[a] claim arising from the rejection, under section 365 ... of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, *the same as if such claim had arisen before the date of the filing of the petition.* (emphasis added).

*See also* H.R.Rep. No. 595, 95th Cong., 1st Sess. 354 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6310; S.Rep. No. 989, 95th Cong., 2d Sess. 65, *reprinted in*, 1978 U.S.Code Cong. & Ad.News 5787, 5851 ("Subsection [502](g) gives entities injured by the rejection of an executory contract or unexpired lease ... a prepetition claim for any resulting damages, and requires that the injured entity be treated as a prepetition creditor with respect to that claim."). The Collier treatise comments that "section 502(g) makes plain that to the extent the claim is allowable and not otherwise disallowable, the attendant claim is treated as a prepetition claim for the damages flowing from the rejection. The injured entity is thus treated as a prepetition creditor as to that claim." 3 *Collier on Bankruptcy,* ¶ 502.08 at 502–98 (15th ed. 1984).

In calculating the amount of Northrop's claim, section 502(b) provides that if the Trustee objects to a claim, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount." *See also In re Davies,* 27 B.R. 898, 900 (Bankr.E.D.N. Y.1983) ("a claim is allowable for those damages resulting from the breach, and the court will determine the amount and the validity of the claim as of the breach. 11 U.S.C. Section 502(b)"). The Code provides a clear directive that whenever general unsecured claims are incurred, whether pre- or postpetition, they are calculated for damage assessment purposes as occurring as of the date the petition was filed. It is clearly not necessary to discount prepetition claims since the pertinent date used

for such a calculation is the date the petition is filed, which occurs after these damages have already been incurred. In contrast, when postpetition damages which do not benefit the estate are incurred, then discounting is required so that the allowed amount of the claim is calculated as of the filing date. This view is reinforced by *In re Marshall's Garage, Inc.,* 63 F.2d 759, 763 (2d Cir.1933), wherein the Second Circuit stated that "[t]he present value ... must be found as of the date of the filing of the petition in bankruptcy, which sets the line of cleavage for provable debts." *See also Connecticut Railway & Lighting Co. v. Palmer,* 305 U.S. 493, 504, 59 S.Ct. 316, 323, 83 L.Ed. 309 (1939). Although *Marshall's Garage* was a case arising under the Bankruptcy Act of 1898, the underlying policy has been carried through in the Code.

Northrop nonetheless argues that the phrase "amount of such claim" as used in § 502(b) must be distinguished from the "value" of the claim and contends that the court should look only at the amount of the payments which Northrop had to pay and in fact did pay out. This court disagrees. Any valuation of a claim is necessarily embodied in § 502(b) so that the amount of the claim to be allowed in the reorganization or liquidation proceedings is properly ascertained. The language of § 502(b) does not prohibit the mechanism of present valuing claims and it is indeed needed to assure the equal treatment of similarly Code-classified creditors.

D. *The Code Mandates That Northrop's Claim for Damages Be Discounted*

Damages in a bankruptcy case must be measured in accordance with accepted contract law principles. *Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134, 135 (3d Cir.1982). The discounting of claims to their present value has traditionally been followed when determining the amount of an unearned obligation which is due in the future. *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1937); *Connecticut Railway & Lighting Co. v.*

*Palmer,* 305 U.S. 493, 504, 59 S.Ct. 316, 323, 83 L.Ed. 309 (1939); *In re Union-Fern, Inc.,* 205 F.Supp. 947, 949 (N.D.N.Y. 1962). In *In re Good Hope Industries, Inc.,* 16 B.R. 702, 703 (Bankr.D.Mass.1982), the court stated that "[a]ctual damages in the bankruptcy setting are calculated in the manner set out by the United States Supreme Court in *City Bank Farmers Trust Co. v. Irving Trust Co.*" In *City Bank,* 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324 (1937), the Court stated:

> [t]he amount of the landlord's claim for the loss of his lease necessarily is the difference between the remainder of the term and the rent reserved both discounted to present worth.

*Id.* at 443, 57 S.Ct. at 297. *See also In re W.T. Grant Co.,* 36 B.R. 939, 941 (S.D.N.Y. 1984) (citing *City Bank* formula with approval); *In re Winston Mills,* 6 B.R. 587, 599 (Bankr.S.D.N.Y.1980)("A reduction of an award to present value is necessitated by the fact that money presently in hand is always more useful than staggered payments in the future.") The rationale for utilizing a discounting analysis was set forth in *Chesapeake & Ohio Railway Co. v. Kelly,* 241 U.S. 485, 490, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916) as follows:

> in computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to the circumstances, for the earning power of money. *When future payments are to be anticipated the verdict should be made upon the basis of their present value only.*

*Id.* at 490, 36 S.Ct. at 632 (emphasis added).

■ Northrop claims to have been damaged by having made 38 monthly mainte-nance payments on Schedules 1 and 2 and 39 monthly maintenance payments on Schedules 3 and 4 after the Filing Date. These damages, when viewed as of the Filing Date, constitute the deprivation of future benefits. According to *Chesapeake & Ohio Railway Co. v. Kelly* and its progeny, the resulting claim is to be made on the basis of its present value, which in this case would be $510,145.99.

Northrop argues that if its claim is discounted, it will be penalized because its damage award will have been reduced twice. Not only will a legal fiction have been employed to "reduce" Northrop's claim to general unsecured thereby decreasing the likelihood of its being paid in full, but the claim will also have been discounted from the original amount sought of $635,265 to $510,145.99. This court recognizes that Northrop's claim will be reduced as a result of discounting, but this outcome is mandated by the Code and treats Northrop on par with other similarly classified general unsecured creditors. Northrop bore the risk of making postpetition payments which did not benefit the estate, especially when viewed in the context of Northrop's failure to pursue its Code-granted right to move for an expeditious assumption or rejection of the lease. Had there been a benefit, Northrop would have been entitled to an administrative priority expense claim and would have been paid in full. The lack of benefit relegates the maintenance payments to general unsecured status which, given the corralling effect of §§ 365(g), 502(g) and 502(b), necessitates classification and calculation for damage assessment purposes as occurring immediately prior to the filing of the petition.[4] It should be emphasized that the

---

4. Northrop also argues that Congress did not intend that its claim and like ones should be discounted, and cites the legislative history of § 502(b) as support:

> Section 502(b) thus contains two principles of present law. First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph. Second, bankruptcy operates as the acceleration of the principal amount of all claims against the debtor. One articulated reason for this is that the discounting factor for claims after commencement of the case is equivalent to the contractual interest rate on the claim. Thus, *this paragraph does not cause disallowance of claims that have not been discounted to a present value because of the irrebutable presumption that the discounting rate and the contractual interest rate (even a zero interest rate) are equivalent.*

result herein obtains rarely and only under those circumstances where the estate does not derive a benefit from the postpetition payments.

For the reasons herein, this court grants the Trustee's objection to Northrop's claim and denies Northrop's motion for partial summary judgment. Northrop's claim is allowed in the amount of $510,145.99.[5]

It is SO ORDERED.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 353 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6309; S.Rep. No. 989, 95th Cong., 2d Sess. 63, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5849 (emphasis added).
Northrop has severely miscontrued § 502(b). The legislative history cited refers to the policy of *disallowing claims pursuant to* § 502(b)(2) for *unmatured interest* as of the Filing Date. The present case does not involve § 502(b)(2) and it is evident, when read in context, that the cited paragraph deals with that particular subsection of § 502(b). H.R.Rep. No. 595, 95th Cong., 1st Sess. 352–53 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6308–09; S.Rep. No. 989, 95th Cong., 2d Sess. 62, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5848.

5. *See supra* footnote 1.