In re ENRON CORP., et al., Debtors.

No. 01–16034 (AJG).

United States Bankruptcy Court,
S.D. New York.

Aug. 2, 2006.

Cadwalader, Wickersham & Taft LLP (Edward A. Smith, Esq., of Counsel), New York, NY, and (Mark C. Ellenberg, Esq., David F. Williams, Esq., Christopher R. Pantel, Esq., of Counsel), Washington, DC, Special Counsel to the Reorganized Debtors.

Kasowitz, Benson, Torres & Friedman LLP (Michael J. Bowe, Esq., David S. Rosner, Esq., Daniel Zinman, Esq., of Counsel), New York, NY, Sheiness, Scott, Grossman & Cohn LLP (H. Miles Cohn, Esq., of Counsel), Houston, TX, for Citrus Trading Corp.

## OPINION REGARDING DEBTORS' OBJECTION TO PROOF OF CLAIM NO. 23159 FILED BY CITRUS TRADING CORP.

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Enron North America Corp. ("ENA"), one of the Debtors, objected to a proof of claim filed by Citrus Trading Corp. ("Citrus"). Citrus's claim is based on trading activity by it and ENA in the natural gas market. Three agreements are at the center of the dispute. One was valuable to ENA because it was in-the-money to ENA; the other two were valuable to Citrus because they were in-the-money to Citrus. To determine the allowable amount of Citrus's claim, ENA contends that ENA's in-the-money position under one agreement should be set off against Citrus's in-the-money positions under the other two agreements because, ENA argues, the three agreements constituted a single contract. In opposition, Citrus asserts that no setoff should occur because the agreements were separate and governed by different master agreements. An examination of the relevant agreements and proceedings before this Court leads to the conclusion that the three agreements at issue were parts of a single contract and, therefore, that the parties' positions under the three agreements should be netted. ENA's objection is granted in this regard only.

The parties dispute how two other gas sale agreements affect Citrus's claim.

They also disagree as to which discount rate should be applied to compute Citrus's damages. Further proceedings are therefore needed to determine the exact amount of Citrus's claim.

## JURISDICTION

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334 and 157(b) of title 28 of the United States Code, under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), and under paragraph 60 of this Court's Order Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors under chapter 11 of title 11 of the United States Code (July 15, 2004). The instant matter is a core proceeding pursuant to section 157(b)(2)(A), (B), and (O) of title 28 of the United States Code. Venue is properly before this Court pursuant to sections 1408 and 1409 of title 28 of the United States Code.

## FACTS AND PROCEDURAL BACKGROUND

### Contractual Background

On November 1, 1988, Citrus agreed to buy gas from Pan National Gas Sales, Inc., (the "Pan National Contract") at the residual fuel oil formula price. On December 5, 1988, Citrus agreed to buy gas, from Amoco Energy Trading Corp. ENA contends and Citrus does not dispute that the agreement with Amoco Energy Trading Corp. expired in 1999 by its own terms and is not relevant to the instant matter. (Debtor Enron North America Corp.'s Objection to Proof of Claim No. 23159 (the "Objection") ¶ 7 n. 5.)

On November 1, 1993, Citrus entered into a master agreement to purchase gas from Enron Gas Marketing, Inc. ("EGM"). (*See* Declaration of David Thames in Support of Citrus Trading Corp.'s Response to Debtor Enron North America Corp.'s Objection to Proof of Claim No. 23159 (the "Thames Declaration") Ex. C.) On January 8, 1994, Citrus entered into a gas sales agreement with Auburndale Power Partners, L.P. (the "Auburndale Contract"). On April 1, 1994, Citrus agreed to sell gas at the commodity natural gas price (also known as the FGT Index Price) to Florida Power & Light ("FPL"), which provides power to the Florida public (the "FPL Contract").

On October 3, 1994, EGM agreed to replace Citrus as buyer in the Pan National Contract ("Letter Agreement 1"). ENA later succeeded to EGM's obligations to purchase gas from Citrus under Letter Agreement 1. Also on October 3, 1994, EGM agreed to sell back to Citrus at the FGT Index Price the same volume of gas EGM had purchased from Citrus under Letter Agreement 1 ("Letter Agreement 2"). ENA credited Citrus, through a monthly credit to its purchase from ENA under Letter Agreement 2, with profits ENA made as a result of the price arbitrage ENA captured between Letter Agreement 1 and Letter Agreement 2.

On November 1, 1997, termination agreements among Citrus Corp., Citrus Trading Corp., Sonat Marketing Company L.P., and Enron Capital and Trade Resources Corp. ("ECT") took effect. (*See* exhibits attached to Citrus's proof of claim No. 15030.) As a result, ENA became the natural gas supplier on behalf of Citrus and to Citrus for a number of natural gas sales contracts previously supplied and managed by Citrus, including the Auburndale Contract. Also according to the termination agreements, ENA became the supplier of the Natural Gas Services Agreement with Florida Power Corpora-

tion, entered into on July 22, 1996 (the "FPC Contract"). ENA claims the FPC Contract is in-the-money to ENA, a position valued [1] at $1,039,900. (Objection ¶ 4.)

Duke Energy LNG Sales, Inc. ("Duke") and Pan National Gas Sales, Inc., merged in June 1997. On December 22, 1998, two agreements amended and restated the Pan National Contract. The first one is the Amendment and Restatement of Gas Purchase Contract as a Transaction Agreement Pursuant to Master Firm Purchase/Sale Agreement, between Citrus, as buyer, and Duke, as seller (the "Duke Contract"). (*See* Thames Decl. Ex. A.) The second one is the Enfolio Master Firm Purchase/Sale Agreement, between Citrus and Duke (the "Enfolio Agreement"). (*See* Thames Decl. Ex. B.)

On August 25, 1999, ECT and FPL entered into the Assignment of Natural Gas Purchase Agreement (the "Assignment Contract"), which resulted in ENA, successor in interest to ECT, being assigned all of FPL's rights under the now terminated FPL Contract.

### Proceedings Before This Court

Commencing on December 2, 2001, and from time to time continuing thereafter, the Debtors, including ENA, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On January 15, 2002, Citrus filed its Motion to Compel Assumption or Rejection of Executory Contracts with the Citrus Companies (the "Motion to Compel"). ENA, in a stipulation dated February 12, 2002, agreed to assume or reject executory contracts with Citrus by April 2, 2002. (*See* Thames Decl. Ex. D.) ENA failed to make a deci-

sion by that day and asked for an extension of time, which Citrus opposed.

On May 2, 2002, Citrus and ENA agreed to the Stipulation and Order Between Citrus Trading Corp. and Enron North America Resolving Motion to Compel Payment of Administrative Expenses (the "Stipulation"). (*See* Thames Decl. Ex. E.) ENA agreed to reject the FPL Contract, Letter Agreement 1, and Letter Agreement 2. (Stipulation ¶ 1.) The Stipulation also contained the following guideline

For purposes of calculating Citrus'[s] rejection damage claims under 11 U.S.C. §§ 365 and 502(g), the Contracts will be viewed as a single contract and thus Citrus will be entitled to a single rejection damage claim....

(Stipulation ¶ 2.)

Prior counsel for Citrus filed the Motion to Compel and signed the Stipulation on behalf of Citrus. Sometime thereafter, Citrus retained new counsel.

Citrus filed proof of claim No. 15030 against ENA for slightly above 150 million dollars on October 15, 2002, the bar date. On July 10, 2003, Citrus filed proof of claim No. 23159 against ENA for approximately 152 million dollars, which superseded claim No. 15030.

On July 15, 2004, the Court entered an order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan, which became effective on November 17, 2004.

### DISCUSSION

#### Parties' Contentions

**ENA's Initial Objection**

On March 11, 2005, ENA filed an objection to Citrus's proof of claim No. 23159.

---

1. ENA speaks of the Contract's "book value." ENA, however, does not use the phrase in the accounting sense of "value at which an asset is carried on a balance sheet." *Black's Law Dictionary* 177 (7th 1999). Rather, ENA

means the value of "a banker or trader's positions." Campbell R. Harvey, *Glossary of Financial and Business Terms*, http:/ /www. nytimes.com/library/financial/glossary/ bfglosb.htm (definition of "book").

In this objection, ENA asserts that Citrus fails to take into account setoff amounts owed by Citrus to ENA under Letter Agreement 1. ENA's understanding of the Letter Agreements is the following

> The Letter Agreements formed part of a single, integrated contract between the same entities. This transaction provided a hedge of the cross-commodity price exposure for Citrus, and allowed ENA to extract value for itself and Citrus from the then existing oil/gas spread. Essentially, ENA became the middleman in the purchase of natural gas from . . . [Pan National Gas Sales, Inc., which ultimately merged with Duke] and subsequent sale to FPL, and in so doing ENA assumed the risk of market fluctuations in the oil/gas spread. ENA thus served in the role of price risk manager for Citrus.

(Objection ¶ 13.)

Thus, ENA's understanding of the purpose served by the Letter Agreements justifies its argument for setoff

> The Letter Agreements and the Assignment Contract function as one, single agreement. Given the inter-relationship of the Letter Agreements and the Assignment Contract, it is not possible to view any of these contracts in a vacuum. The Citrus Claim relies on the alleged value of the credit owed by ENA to Citrus under Letter Agreement 2. However, Citrus has failed to setoff against the amount it is owed under Letter Agreement 2 the amount Citrus owes ENA under Letter Agreement 1, which is deep[-]in[-]the[-]money to ENA. ENA's book value[2] of the amount it is owed on Letter Agreement 1 is $93,712,576 due ENA.

(Objection ¶ 15) (footnote added).

Additionally, ENA contends that Citrus fails to calculate the value of the credit it claims to be owed under Letter Agreement 2 as of December 2, 2001, the date of ENA's bankruptcy petition. Further, ENA reproaches Citrus with overstating rejection damages due Citrus under the Auburndale Contract because Citrus does not calculate its damages based on the natural gas price prevailing on the petition date, as required by section 365(g) of the Bankruptcy Code, and because Citrus does not include accounts receivable due ENA.

Finally, ENA blames Citrus for not taking into account setoff amounts owed by Citrus to ENA under the FPC Contract.

**Citrus's Response**

In its Response filed on May 19, 2005, Citrus modifies its proof of claim. Among other corrections, Citrus agrees "that its damage claims regarding Letter Agreement 2, the FPL Agreement, and the Auburndale Contract should be discounted to present value as of the petition date." (Citrus Trading Corp.'s Response to Debtor Enron North America Corp.'s Objection to Proof of Claim No. 23159 (the "Response") ¶ 4.) Citrus, however, does not use the same discount rate as ENA, and contends that "ENA used LIBOR for its discount rate, which is composed of two parts: an underlying Treasury rate, representing the risk-free time value of money, and a risk premium associated with 'AA' rated financial firms. Since performance risk is no longer at issue because Letter Agreement 2 has terminated due to ENA's rejection, only the first component should be used in determining the time value of future performance obligations." (Resp.¶ 23.)

Regarding the Auburndale Contract, Citrus agrees to take into consideration the accounts receivable pointed to by ENA. Regarding the same contract, how-

---

2. *See supra* note 1.

ever, Citrus adjusts the discount rate to the number it thinks is correct and also takes issue with ENA's escalation rate for the contract price and forward price curve.

Further, Citrus's understanding of the Letter Agreements is the following

> Letter Agreement 1 provided Citrus with a hedge with respect to a contract for the purchase of natural gas from a third party, Duke, and the sale of the same quantity of gas to another third party, FPL. Pursuant to Letter Agreement 1, in which ENA was to purchase from Citrus the same quantity of gas, at the same price, that Citrus was required to purchase from Duke, ENA 'assumed the risk of market fluctuations in the oil/gas spread' with respect to the Duke Contract.... But ENA also obtained the benefit of the Duke Contract, which then had substantial potential value. As a result, ENA agreed to pay consideration for this exchange, and the consideration took the form of credits that would be given on the sale of gas to Citrus under Letter Agreement 2.

(Resp.¶17) (citation omitted).

As of December 2, 2001, "Citrus expected to receive two income streams from this transaction. First, Citrus would benefit from the credits given in the purchase of gas under Letter Agreement 2.... Second, Citrus would profit from the FPL Agreement assigned to ENA...." (Resp.¶19.) Further, "Citrus bargained for a hedge that would lock in its profit from that contract and thereby avoid the inherent risk in a long-term gas supply contract. Allowing ENA to 'setoff' its position on Letter Agreement 1 would turn the transaction on its head—Citrus would be left with the risk that ENA agreed to hedge but would receive none of the prom-

ised consideration for the position that ENA agreed to purchase." (Resp.¶20.)

To counter ENA's setoff argument, Citrus notes ENA rejected Letter Agreements 1 and 2 pursuant to the Stipulation. Citrus also notes that rejection of a contract by a debtor under section 365 of the Bankruptcy Code results, on the one hand, in a claim for breach of contract held by the other party to the contract (here, Citrus) and, on the other hand, the end of any contract obligation owed by this other party. Citrus concludes that now it does not owe anything to ENA "under the Letter Agreement 1 or any other rejected· contract." (Resp.¶9.)

Citrus acknowledges the rest of the language in the Stipulation, but contends that the Stipulation does not modify the contract provisions applicable between the parties. Citrus argues that the Court must consider these contract provisions, especially the ones concerning default, to determine rejection damages.

Citrus points to the Duke Contract and the Enfolio Agreement. Citrus explains that the Enfolio Agreement, including its provisions regarding default and netting, applies to the Duke Contract and Letter Agreement 1, but not Letter Agreement 2, which, according to Citrus, is governed by the master agreement dated November 1, 1993.

Citrus argues that the Enfolio Agreement and the Duke Contract preclude ENA's setoff argument. Citrus notes that, in the event of default, the Enfolio Agreement permits setoff only between terminated transactions covered by the Enfolio Agreement, and bars recovery on account of a positive position. Citrus concludes that ENA, as a defaulting party under Letter Agreement 1,[3] to which the

---

**3.** Citrus contends that ENA's bankruptcy and financial condition at the petition date

amounted to default under Letter Agreement 1. (Resp. ¶14 n. 17). Alternatively, Citrus

Enfolio Agreement does apply, cannot recover anything for its positive position under Letter Agreement 1. Then, ENA has nothing to set off against amounts that ENA owes to Citrus under Letter Agreement 2, to which the Enfolio Agreement does *not* apply.

Finally, as to the FPC Contract, Citrus's Response contends that ENA cannot setoff the value of the FPC Contract because ENA stopped performing under the FPC Contract and later rejected the FPC Contract. Citrus concludes that ENA, as the party in default, is not entitled to any benefit under the FPC Contract. Citrus also refuses ENA's calculation of the setoff under the FPC Contract because Citrus believes that ENA fails to identify the contracts on which the setoff is based and to explain how ENA calculates the value of the FPC Contract.

### ENA's Reply in Support of the Objection

In its Reply filed on May 31, 2005, ENA says it will consent to "a claim for that portion that exceeds the dollar value of ENA's in-the-money position under Letter Agreement 1, which must be netted against Citrus'[s] claim." (Debtor Enron North America Corp.'s Reply in Support of Objection to Citrus Trading Corp.'s Proof of Claim No. 23159 (the "Reply") 3.) ENA calculates that Citrus's allowed claim will then be approximately 28 million dollars.

ENA emphasizes that Citrus, in its Motion to Compel, "stated that it and ENA were parties to 'three interrelated executory contracts'—Letter Agreement 1, Letter Agreement 2, and the FPL Agreement as assigned to ENA through the Assignment Contract." (Reply 5–6) (quoting Motion to Compel 1). ENA notes that Citrus's mo-

tion spoke of the "close relationship" between these agreements (Reply 6) (quoting Motion to Compel 2) and acknowledged that the Letter Agreements were entered into "each in contemplation and reliance on the other." (*Id.*) (quoting Motion to Compel 3). ENA points out that in Citrus's own words the three agreements "are part of one overall contract and can only be assumed or rejected as a whole." (*Id.*) (quoting Motion to Compel 3).

ENA argues that "Citrus did not want ENA to cherry pick different pieces of the transaction, assuming those pieces ENA deemed favorable and rejecting those pieces it deemed unfavorable. Citrus stated that it would not object to ENA's choice of assumption or rejection of the contracts, as long as ENA's decision was not delayed." (*Id.*) (citing Motion to Compel 3–4).

Moreover, ENA points to paragraph 2 of the Stipulation. ENA argues that the plain language of the Stipulation prevents Citrus from refusing setoff of the amount under Letter Agreement 1 against the amounts under Letter Agreement 2 and the Assignment Contract.

According to ENA, "[n]either party wanted the other to cherry pick its respective obligations through the consequences of selective assumption or rejection of different pieces of the deal." (Reply 7.) ENA believes Citrus's current argument is "precisely the cherry picking prohibited by the [Stipulation]." (*Id.*)

To Citrus's argument that Citrus does not owe anything to ENA under Letter Agreement 1 because ENA rejected Letter Agreement 1, ENA responds "the issue

---

asserts that, if not bankruptcy, rejection of Letter Agreement 1 amounted to default as of the petition date. (*Id.*) According to Citrus, default triggered termination of the agreements at issue. ENA answers that, if Citrus is

correct, the motion to compel was "pointless" and the stipulation providing for rejection of the agreements "unnecessary." (Reply 8 n. 8.)

is not Citrus'[s] performance, but rather the calculation of its damages." (Reply 8).

ENA also stresses that Citrus's argument means that "the ENA Debtor's decision to reject Letter Agreement 1, which was deep[-]in[-]the[-]money to ENA at the time of the petition, would have been economic madness." (*Id.*) ENA says that it "did not engage in economic madness. On the contrary, rejection of the agreements as a 'single contract' was economically rational because ENA was preserving the value of its in[-]the[-]money position through the netting requirement in the calculation of Citrus'[s] rejection damage claim." (*Id.*)

As for Citrus's assertion that allowing netting would "turn the transaction on its head" and deprive Citrus of consideration, ENA explains that Citrus did receive consideration through in-the-money positions under Letter Agreement 2 and the FPL Agreement. (Reply 8 n. 10.)

ENA additionally notes that Citrus described Letter Agreement 1 and Letter Agreement 2 as a "swap agreement." (Reply 6) (citing Motion to Compel ¶ 5). This Court has examined the typical effect of swap agreement termination, ENA says, including in the *Enron* case. ENA cites to a decision in which this Court stated, "[o]nce terminated, a swap agreement typically provides that all transactions between the parties are cancelled and a single net amount will be due based upon market conditions at the time of termination." *In re Enron Corp.*, 306 B.R. 465, 472 (Bankr.S.D.N.Y.2004). ENA also quotes the *Collier* treatise, which notes that "if the debtor is 'in[-]the[-]money' under the terminated swap agreement, the exercise by the swap participant of its termination rights may require it to pay an amount to the debtor." 5 *Collier on Bankruptcy* ¶ 560.04[1] (Alan N. Resnick &

Henry J. Sommer et al. eds., 15th ed. rev.2006).

ENA emphasizes that "[s]ection 560 of the Bankruptcy Code, which addresses contractual rights to terminate swap agreements, expressly preserves the right of any swap participant 'to offset or net out any termination values or payment amounts arising under or in connection with any swap agreement' without limitation by operation of any provision of the Bankruptcy Code." (Reply 9) (quoting 11 U.S.C. § 560 (2000), *amended by* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 1402, 119 Stat. 23, 214). As the purpose of section 560 "is to avoid cherry picking resulting from selective assumption or rejection" (Reply 9) (citing 5 *Collier on Bankruptcy* ¶ 560.04[2] ), ENA asserts that the Stipulation has the similar purpose of preventing Citrus from "cherry picking." (*Id.*)

Finally, ENA's Reply contends that if "as Citrus argues, the Enfolio Agreement is integrated with Letter Agreement 1 such that its terms govern the parties' rights and obligations in the wake of ENA's rejection, then Letter Agreement 2 is necessarily integrated with the Enfolio Agreement as well. In other words, Citrus cannot assert that the Enfolio Agreement and Letter Agreement 1 are part of a single contract without also agreeing that Letter Agreement 2 is part of that same single contract. Accordingly, if (as Citrus argues) Letter Agreement 1 is a 'Transaction' under the Enfolio Agreement, Letter Agreement 2 must also be a 'Transaction' under the Enfolio Agreement," (Reply 10) and, therefore, the Enfolio Agreement permits netting of the parties' positions under the Letter Agreements. ENA also asserts that "[t]he 1993 master agreement that (according to Cit-

rus) governs Letter Agreement 2 also requires netting." (Reply 11.)

**Hearing**

A hearing was held regarding the instant contested matter on June 2, 2005. Citrus stated during oral argument that paragraph 2 of the Stipulation "makes sure that there can be recoupment," and "doesn't say at all ... that ... all the positions would be netted together." (Transcript of Oral Argument at 22, *In re Enron Corp.*, No. 01–16034 (Bankr. S.D.N.Y. June 2, 2005).) Citrus asserts that paragraph 2 of the Stipulation contains language typically used to deal with recoupment issues, not swap or netting issues. (Tr. 30–31.)

ENA responds that paragraph 2 of the Stipulation has nothing to do with recoupment. (Tr. 40–41.) ENA points out that the Stipulation refers to section 502(g) of the Bankruptcy Code, which mandates that rejection damages be calculated as of the time of the petition. (Tr. 53.) Therefore, according to ENA, if the parties "were trying to deal in paragraph 2 ... with some sort of recoupment issue related to pre-petition and post-petition performance," they would not have referred to section 502(g). (Tr. 54.)

*The Court's Determination*

■ The central issue is whether ENA's in-the-money position under Letter Agreement 1 and Citrus's in-the-money positions under Letter Agreement 2 and the Assignment Contract should be netted to determine the amount of Citrus's claim. The Court finds that the positions should be netted because both Letter Agreements and the Assignment Contract must be considered as one single contract. The Motion to Compel and the Stipulation refer to this unity and preclude Citrus from arguing against netting. Moreover, the Letter Agreements and Assignment Contract themselves and the nature of the transac-

tion they embody—a swap agreement—mandate netting as well.

As the Court determines that the Letter Agreements and the Assignment Contract constitute one single swap agreement and that the rejection of that swap agreement results in netting of the parties' positions, the Court need not decide whether netting is required under the Enfolio or 1993 Agreements or whether ENA was in default under these two agreements.

The Court, however, needs further submissions from the parties regarding other components of Citrus's claim—amounts due under the Auburndale Contract and the FPC Contract, appropriate discount rate—to make a determination regarding the amount of Citrus's claim.

**Motion to Compel**

■ As ENA points out, Citrus itself admitted in the Motion to Compel that the Letter Agreements and the Assignment Contract were "three interrelated executory contracts" (Motion to Compel 1). Citrus spoke of the "close relationship" among these agreements (*Id.* at 2) and acknowledged that the Letter Agreements were entered into "each in contemplation and reliance on the other." (*Id.* at 3.) Citrus even stated that the three agreements "are part of one overall contract and can only be assumed or rejected as a whole." (*Id.*) This statement lends credibility to ENA's understanding of Citrus's intent when Citrus filed the Motion to Compel. Presumably, Citrus wanted to prevent ENA from choosing which of the three agreements to assume or reject. It was important to Citrus that the three agreements be dealt with together. Thus, Citrus asserted that the three agreements constitute one single contract in its Motion to Compel whereas now it contends the

opposite when the argument is not to its advantage anymore.[4]

**Stipulation**

██ Paragraph 2 of the Stipulation also prevents Citrus from arguing against netting of the positions under the three agreements. The parties agreed to the Stipulation and the Court issued an order approving it. For purposes of interpretation, the Stipulation "is therefore more akin to a run-of-the-mill contract than to a court order." *Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.)*, 153 F.3d 61, 66 (2d Cir.1998). Furthermore, "[i]f the language of a contract is clear and unambiguous, the contract is to be given effect in accordance with its terms." *Beckerman v. M. Hidary & Co.*, 324 B.R. 434, 443 (D.Conn.2005) (quoting *RLI Ins. Co. v. Hartford Accident and Indem. Co.*, 980 F.2d 120, 122 (2d Cir.1992)).

Citrus agreed to the following language in the Stipulation

> For purposes of calculating Citrus'[s] rejection damage claims under 11 U.S.C. §§ 365 and 502(g), the Contracts will be viewed as a *single contract* and thus Citrus will be entitled to a single rejection damage claim. . . .

(Stipulation ¶ 2) (emphasis added).

The "Contracts" are the FPL Contract, Letter Agreement 1, and Letter Agreement 2. (Stipulation pp. 1–2.) This unambiguous language in the Stipulation shows that the parties intended these three agreements to constitute one single contract and also supports ENA's argument that the parties were insuring themselves against each other's "cherry picking." Citrus is therefore prohibited from requesting an award of damages on the basis of Letter Agreement 2 and the Assignment Contract[5] while ignoring ENA's in-the-money

---

**4.** The parties have not explicitly discussed whether the Court should apply the equitable doctrine of judicial estoppel, which "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by the party in a prior legal proceeding." *In re G.S. Distribution, Inc.*, 331 B.R. 552, 564 (Bankr.S.D.N.Y.2005) (quoting *Shoppers World Cmty. Ctr., L.P. v. Bradlees Stores (In re Bradlees Stores, Inc.)*, 2001 WL 1112308, at *10, 2001 U.S. Dist. LEXIS 14755, at *33 (S.D.N.Y. Sept. 20, 2001)). "A court has discretion in determining whether a party should be judicially estopped." *Id.* (citing *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)). Nonetheless, a court must consider certain factors before making that determination

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* (quoting *New Hampshire v. Maine*, 532 U.S. at 750–751, 121 S.Ct. 1808).

In the instant matter, Citrus's earlier position is clearly inconsistent with its current position. Citrus asserted in its Motion to Compel and agreed in the Stipulation that the Letter Agreements and the Assignment Contract should be considered as one; Citrus now asserts that these agreements should not be considered as one. Further, this Court relied on the contents of the Stipulation to approve it. Finally, by agreeing to the Stipulation, ENA abandoned the right to reject or assume the agreements separately, but made sure that netting would occur. Citrus would gain an unfair advantage if allowed now to assert that the agreements ought to be examined separately, thus thwarting ENA's expectations.

Therefore, it appears that all the factors in favor of applying judicial estoppel would be present and preclude Citrus from even arguing that the agreements should be treated separately. In any event, the Court need not decide this issue because Citrus is bound by the Stipulation.

**5.** As a reminder, the Assignment Contract assigned FPL's rights under the now terminated FPL Contract to ECT and ultimately ENA.

position under Letter Agreement 1.

### Contents and Nature of Swap Agreement

First, the Court notes that the Letter Agreements refer to each other, therefore showing their interdependence. (Letter Agreement 1 ¶ 3; Letter Agreement 2, "DAILY CONTRACT QUANTITY," "OTHER" ¶ 3.)

■ Additionally, Citrus admitted that the three agreements constitute one swap agreement. (Motion to Compel ¶¶ 2, 5.) The provisions of the Bankruptcy Code concerning swap agreements aim at preventing "cherry picking" by the parties. *See* 11 U.S.C. § 560 (2000), *amended by* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 907(j), (o)(10), 119 Stat. 23, 178, 182; 5 *Collier on Bankruptcy* ¶ 560.04[2]. The Court also takes into consideration its own decisions regarding swap agreements. *See In re Enron Corp.*, 306 B.R. 465 (Bankr.S.D.N.Y.2004); *In re Enron Corp.*, 279 B.R. 671 (Bankr.S.D.N.Y.2002).

■ Although rejection of an agreement does not equal termination, 3 *Collier on Bankruptcy* ¶ 365.09[3], this distinction does not affect the determination of Citrus's rejection damages. Termination of swap agreements generally requires that the parties' positions be netted. 306 B.R. at 472, 279 B.R. at 692. Rejection leads to a similar result for the following reasons.

■ Rejection of a contract by the debtor amounts to a breach immediately prior to the petition date. *In re Riodizio, Inc.*, 204 B.R. 417, 425 (Bankr.S.D.N.Y. 1997) (citing 11 U.S.C. § 365(g)); *In re O.P.M. Leasing Services*, 56 B.R. 678, 682 (Bankr.S.D.N.Y.1986) (same). The other party then holds a general unsecured claim for rejection damages against the debtor. *In re O.P.M. Leasing Services*, 56 B.R. at 682–683. Under general contract law,

damages are intended to give the benefit of the bargain to nonbreaching parties by awarding a sum of money that will put them in as good a position as they would have been in had the contract been performed. Restatement (Second) of Contracts § 347 cmt. a (1981). Thus, rejection requires netting too because, if Citrus received rejection damages only based on its in-the-money positions under the swap agreement without taking into account ENA's in-the-money position under the same swap agreement, Citrus would receive more than what it bargained for. ENA's in-the-money positions must therefore be taken into consideration to compute Citrus's rejection damages.

### Citrus's Remaining Arguments

■ Citrus quotes, "rejection constitutes a breach, it also excuses performance by the nonbankrupt party." *In re Crippin*, 877 F.2d 594, 597 (7th Cir.1989) (citing *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.)*, 780 F.2d 1482, 1486 n. 3 (9th Cir. 1986)). In other words, "rejecting a contract allows a debtor to escape a contract's burdens; but, at the same time, the debtor must also give up any future benefit he might receive from the contract." *Id.* (citing *In re Schnabel*, 612 F.2d 315, 317 (7th Cir.1980)). Thus, Citrus argues that ENA lost the benefit of its in-the-money position under Letter Agreement 1 because ENA rejected Letter Agreement 1.

Citrus refers to inapplicable legal principles. The instant contested matter does not involve enforcing Letter Agreement 1, but pertains to the calculation of Citrus's rejection damages. As written above, Letter Agreement 1 is one component of one single swap agreement and the nature of a swap agreement, coupled with general contract law, requires netting of the parties' positions to calculate rejection damages.

Citrus also contends that netting would "turn the transaction on its head" and deprive Citrus of consideration. (Resp.¶ 20.) Citrus ignores the structure of the swap agreement, which provides consideration through Citrus's in-the-money positions under Letter Agreement 2 and the FPL Agreement.

During oral argument, Citrus argued that paragraph 2 of the Stipulation concerns recoupment, not netting. Recoupment is an equitable doctrine that, as the Court noted during the hearing, may be especially relevant when a party seeks to net prepetition and postpetition obligations. (Tr. 49–50; *see* 5 *Collier on Bankruptcy* ¶ 553.10.) Citrus's argument would be expected if there were both prepetition and postpetition amounts due. In the instant matter, however, the Stipulation provided for rejection of the Letter Agreements and the Assignment Contract. The Bankruptcy Code treats as prepetition any amount due because of rejection. 11 U.S.C. § 365(g) (2000); 11 U.S.C. § 502(g) (2000), *amended by* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 910(b), 119 Stat. 23, 184. As all amounts due are prepetition, there was no need for the Stipulation to cover the issue of recoupment by providing for the unity of the three agreements as a single contract. The parties understood that any amount due after rejection would be prepetition because they referred to section 502(g) of the Bankruptcy Code, which requires that rejection damages be computed as of the petition date. (Stipulation ¶ 2.) Therefore, Citrus's argument that the parties intended to deal with recoupment is illogical and disingenuous. It is based on the attempt by the client's replacement counsel to avoid the consequences of the agreement for which the client is obligated. The Stipulation simply guaranties netting and makes sure neither ENA nor Citrus would seek the benefits of in-the-money positions while ignoring less favorable positions. Any argument to the contrary is without merit and disingenuous on the part of Citrus.

▇▇ Moreover, as the Court construes the Stipulation, the equivalent of a contract between the parties, "an interpretation which gives ... [an] effective meaning to all the terms is preferred to an interpretation which leaves a part ... of no effect." Restatement (Second) of Contracts § 203 (1981). Citrus has argued that rejection of the three agreements meant ENA's default and no amount due to ENA at all, despite any of ENA's in-the-money positions. Under that argument, making sure that the agreements are treated as one in the Stipulation serves no purpose and certainly does not preserve recoupment. Therefore, Citrus's argument that paragraph 2 of the Stipulation deals with recoupment has no merit.

### CONCLUSION

The Court finds that ENA's in-the-money position under Letter Agreement 1 and Citrus's in-the-money positions under Letter Agreement 2 and the Assignment Contract should be netted to determine the amount of Citrus's claim. Thus, the Debtor's objection is granted regarding the issue of netting.

The Court, however, does not decide yet which other amounts due under the Auburndale Contract and the FPC Contract should be taken into consideration to adjudicate the amount of Citrus's claim. Nor does the Court set a discount rate to reach proper valuation of Citrus's claim yet.

The Debtor shall settle an order consistent with this opinion, which shall include a date for further proceedings to determine the amount of Citrus's claim.